**UNITED STATES of America,**

v.

**Alicia FULTON, Defendant.**

**Criminal No. 95–10244–REK.**

United States District Court,
D. Massachusetts.

March 18, 1997.

John Salsberg, Salsberg & Cunha, Boston, MA, for Wanda Zani.

Miriam Conrad, Office of the Federal Defender, Boston, MA, for Alicia Fulton.

Emily R. Schulman, U.S. Attorney's Office, Boston, MA, for U.S.

OPINION

KEETON, District Judge.

### I.

The sentencing hearing in this case was continued to allow time for an evidentiary hearing (including some oral testimony as well as other evidentiary submissions) and submission of further memoranda of authorities. Now before the court (in addition to oral submissions of record at the hearings of September 13 and 30, 1996), are the following:

(1) Presentence Report (PSR), prepared August 14, 1996, Revised September 6, 1996.

(2) Defendant Alicia Fulton's Supplemental Sentencing Memorandum (Docket No. 140, filed November 22, 1996);

(3) Government's Memorandum in Support of Application of Cocaine Base Sentencing Guidelines (Docket No. 141, filed November 22, 1996);

(4) Government's Reply Memorandum in Support of Application of Cocaine Base Sentencing Guidelines (Docket No. 142, filed December 18, 1996);

(5) Defendant's Reply to Government's Memorandum in Support of Application of Cocaine Base Sentencing Guidelines (Docket No. 143, filed December 18, 1996).

### II. Background Facts

The defendant, Alicia Fulton, pled guilty to Counts I–III of a three-counts, four-defendants indictment. The three counts to which she pled were as follows:

| | Title & Section | Charges |
|---|---|---|
| Count I | 21 U.S.C. §§ 963 & 841(b)(1)(A)(iii) | Conspiracy to Import Cocaine Base |
| Count II | 21 U.S.C. §§ 952 & 841(b)(1)(A)(iii) | Importation of Cocaine Base |
| Count III | 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(iii) | Possession w/Intent to Distribute Cocaine Base |

Pre–Sentence Report ("PSR") Coversheet (Rev. 9/6/96).

As stated in parts of the PSR to which defendant Fulton and her counsel made no objections at the sentencing hearings of September 13 and 30, 1996, Fulton was arrested at Logan International Airport on July 16, 1995, after customs inspectors meeting a flight from Jamaica discovered a fingernail-sized wax pellet in Fulton's belongings that field-tested positive for the presence of cocaine, and after Fulton admitted that she and her three co-defendants had ingested numerous similar pellets. PSR ¶¶ 14–16; Deft. Ex. 101. Fulton ultimately produced from her person 61 pellets, which were determined by analysis at the Drug Enforcement Administration ("DEA") Northeast Regional Lab to consist of 130.1 grams of 81 percent pure cocaine base. PSR ¶ 15. A total of 674 grams of cocaine base ranging in purity from 79 to 83 percent were seized in pellet form from Fulton and her co-defendants. PSR ¶ 29.

The PSR "Offense Level Computation" was as follows:

The Guideline Sentencing Range has been calculated using the guidelines in effect at the time of sentencing. The guidelines that affect the offense level and/or the criminal history calculations have not changed since the instant offense was committed. The counts of conviction are being grouped per 3D1.2(d).

**Base Offense Level:** The guideline for this offense is 2D1.1(3)(c) Importation of Drugs. Guideline 2D1.1(3)(c) provides that the base offense level is determined by the

amount of drugs involved in the offense which was foreseeable by the defendant, including acts of others in furtherance of the jointly undertaken criminal activity. As the details of the *Offense Conduct* indicate, the defendant was aware of the drugs which her codefendant ingested and attempted to import. She is therefore being held accountable for all of the cocaine base described in the *Offense Conduct* section— 674.7 grams of cocaine base. Guideline 2D1.1(c)(2) provides for a base offense level of 36 for offenses involving at least 500 grams but less than 1.5 kilograms of cocaine base.

**Specific Offense Characteristics:** Per 2D1.l(b)(4), if the defendant meets the criteria set forth in subdivisions (1)-(5) of 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases) and the offense level determined above is level 26 or higher there is a two-level decrease. The defendant appears to meet the criteria.

PSR ¶¶ 28–30. This led (after further downward adjustments of –4 under 3B1.2(a) and –3 for acceptance of Responsibility) to a Total Offense Level of 27 and a Guideline Range (with Criminal History Category I) of 70–87 months.

As the government sees the matter:

The Probation Department calculated Fulton's base offense level according to the amount of cocaine base seized from her and her co-defendants. PSR ¶ 29; U.S.S.G. § 2D1.1(c)(2) (drug quantity table provides that base offense level for "[a]t least 500 g but less than 1.5 kg of cocaine base" is 36). The resulting base offense level was greater than Fulton would have received had the guidelines for powder "cocaine" applied. See § 2D1.1(c)(7) (Providing that base offense level for "[a]t least 500 g but less than 2 kg of cocaine" is 26). Seizing on this disparity, Fulton claims that the Guidelines' enhanced cocaine base penalties should not be applied in this case, because the government has not proven that the cocaine base is "crack." See § 2D1.1 at Note D (explaining that "cocaine base,' for purpose of this guideline, means 'crack' ").

In support of its contention that the cocaine base at issue here is in fact "crack," the government submitted the affidavit of DEA Special Agent Damian P. Farley, the drug custodian for the DEA's Boston office. Agent Farley has examined "hundreds of crack cocaine exhibits" in his nine years with the agency. Farley Aff. ¶¶ 1, 3. Agent Farley stated that, given their "distinguishing" "off-white, rock-like" physical characteristics, there was no doubt that the pellets seized from Fulton and her co-defendants were "crack cocaine and would be sold on the street and used as crack cocaine." Farley Aff. ¶¶ 4, 5. Agent Farley further testified at the September 30, 1996 hearing that what he saw in the exhibits "is crack cocaine." 9/30 Tr. 2–42. The government also submitted the affidavit of Stephen J. Hoenig, a DEA forensic chemist, who analyzed the pellets seized from Fulton and her co-defendants. Hoenig stated that the substance he examined "was an off-white, rock-like substance" that was "chemically and visually indistinguishable from the hundreds of other" crack exhibits he had examined in the past. Hoenig Aff. ¶ 7 & n. 1 . . . .

Fulton in turn submitted an affidavit of chemist Patrick Demers which asserted that the cocaine base in question is not "crack" because the DEA lab reports do not indicate that the substance was made by combining cocaine hydrochloride with sodium bicarbonate, and because the substance is "not rocklike." Demers Aff. ¶ 1, 2–4 . . . .

Docket No. 141 at 2–4.

As defendant Fulton sees the matter:

Through semantic sleight-of-hand, the Government's Memorandum attempts to revise the record in this case. The primary techniques employed to this end are liberal paraphrasing of the evidence in a way that does not accurately reflect it and the substitution of the word "crack" for the phrase "cocaine base."

The following examples illustrate the point:

1) The Government's Memorandum summarizes Hoenig's affidavit as concluding that the substance was " 'chemically

and visually indistinguishable from the hundreds of other' crack exhibits he had examined in the past." Government's Memorandum at 3, 14. The full quotation from Hoenig's affidavit does not use the word "crack" to describe the other exhibits that he has examined, but instead uses the phrase "cocaine base." Farley Affidavit, ¶ 8. In substituting the crucial word "crack," the government relies upon Hoenig's affidavit, in which he stated, "I do not distinguish or imply a distinction between cocaine base and crack cocaine. Rather, I recognize crack and crack cocaine as colloquial terms that are virtually synonymous with the scientific term cocaine base." Hoenig Aff., ¶ 2 n. 1. The government now concedes that this assertion is contrary to the current guidelines and the Sentencing Commission's intent in amending them. Government's Memorandum at 21 n. 14.

2) The government's Memorandum asserts that "Farley testified that the pellets, broken down into smaller chunks or rocks, would have been smoked on the street as crack cocaine." Government's Memorandum at 12. *See also id.* at 13. In fact, in the cited portions of the transcript, Farley testified that such pellets would not be smoked in that form but "would have to be broken up before you could use it, smoke it." Tr. 2–33 (during court's questioning of witness). This testimony does not convey the affirmative conclusion that the government now seeks to attribute to it.

3) The Government's Memorandum paraphrases Farley as stating that *"there was no doubt* that the pellets seized ... were 'crack cocaine and would be sold on the street and used as crack cocaine.'" Government's Memorandum at 3 (emphasis added). The assertion that "there was no doubt" about this conclusion appears nowhere, in words or substance, in Farley's affidavit.

4) The Government's Memorandum attributes to Hoenig an assertion that he never made: that "even in cases where sodium bicarbonate is used to convert cocaine hydrochloride into crack cocaine base, traces of sodium bicarbonate will not necessarily be detectable in the base[.]" Government's Memorandum at 16. The

quoted portion of Hoenig's affidavit that follows, see id. and Hoenig Aff., ¶ 8, simply asserts his theory about the absence of any trace of a processing agent in the samples he tested. Neither the affidavit nor his testimony indicates any foundation for this theory. His testimony in fact indicates the contrary: Hoenig stated that, in most of the cocaine base exhibits that he has analyzed, he has found sodium bicarbonate. 1–33.

5) The government makes much of the claimed absence of visible "small air pockets" in its attempt to undermine Demers' description of the pellets as containing compressed powder. Government's Memorandum at 18, 22. Demers consistently used the phrase, "entrained air" to distinguish between a compressed power, like an aspirin tablet, and a rocklike substance, like rock candy. He specifically rejected the government's focus on "air pockets":

> The appearance to me is one of a powder with what I call entrained air, not air pockets. Entrained air when you take a powdery material doesn't allow light to penetrate it and has a much different appearance of a piece of, let's say colored glass or crystalline material like a piece of rock candy. And that is the distinction that I make between material that is compressed and is hard and material that is crystalline in one solid crystal.

Tr. 2–98.

6) In attempting to rebut defendant's argument that the chemical nature of the substance may have been affected by the solutions used to clean the pellets, the government asserts that its chemist testified that he "removed the intact outer coatings." Government's Memorandum at 20 (emphasis added), citing 1–41. The transcript contains no testimony regarding whether or not the coating was intact: Hoenig testified that he did not examine or analyze the wrapping of the pellets. 1–30, 31. To similar effect is the claim that "Hoenig's testimony makes clear that the contents of the pellets were not wet, as they would have been if the decontamination solution had permeated the outer coat-

ing." Government Memorandum at 20. The government cites no testimony on this point, and none exists.

7) The government asserts, in a tangential footnote, that Fulton pleaded guilty to possessing with intent to distribute cocaine base. Government's Memorandum at 4 n. 2. When defendant changed her plea, she specifically noted her dispute that the substance was cocaine base.

Docket No. 143 at 1–4.

## III.

Disputes between counsel about inferences to be drawn from the contrasting testimony of the witnesses are to a large extent off the mark. Each attorney asks the court to draw inferences that as a finder of facts the court does not draw, as explained further in Parts VI and VII below. More significantly, however, reasons exist for concluding that the disputes about inferences that may be drawn concern inferences about matters collateral to issues of law and fact that the court must decide to determine the appropriate sentence in this case.

This opinion turns first, in Parts IV and V, to stating and explaining reasons for this conclusion. Parts VI and VII return to explaining inferences and findings based on the entire record before the court in this case.

## IV.

In determining disputes about the law that (a) defines the scope of a district court's discretion in sentencing, and (b) defines the meaning of words and phrases such as "cocaine," "cocaine base," and "crack," a court may appropriately, and perhaps even must, begin by considering any statutory directives on point.

Potentially material statutory provisions are quoted in full here, for convenient reexamination in relation to references throughout this opinion. Following the quoted statutory provisions are potentially relevant provisions of the Sentencing Guidelines.

A section of Title 18, sometimes described as enacting an "escape valve" with respect to statutory prescription of mandatory minimum sentences, prescribes five conditions that must be satisfied for a first offender to escape a mandatory minimum.

**(f) Limitation on applicability of statutory minimums in certain cases.**—Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 961, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 *without regard to any statutory minimum sentence*, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise as defined in 21 U.S.C. 848; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f) (emphasis added).

A definitional section of Title 21 of the United States Code, though not explicitly

defining "cocaine" or " cocaine base," does define "narcotic drug" as meaning

any of the following whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

. . .

(C) Coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed.

(D) Cocaine, its salts, optical and geometric isomers, and salts of isomers.

(E) Ecgonine, its derivatives, their salts, isomers, and salts of isomers.

(F) Any compound, mixture, or preparation which contains any quantity of any of the substances referred to in subparagraphs (A) through (E).

21 U.S.C. § 802(17).

Section 821 of Title 21 prescribes schedules of controlled substances, and § 811 authorizes the Attorney General to modify the schedules and prescribes criteria for classification of substances. The parties have not called to the court's attention, however, and the court is not aware of, any official action by or under the direction of the Attorney General that would be decisive of the disputes in this case.

Another relevant statute provides:

(a) Unlawful acts

Except as authorized by this subchapter [SUBCHAPTER I—CONTROL AND ENFORCEMENT, of CHAPTER 13— DRUG ABUSE PREVENTION AND CONTROL, of TITLE 21—FOOD AND DRUGS], it shall be unlawful for any person knowingly or intentionally—

1) to manufacture, distribute or dispense, or possess with intent to distribute, a controlled substance. . . .

(b) Penalties

Except as otherwise provided in section 849, 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:

(1) (A) In the case of a violation of subsection (a) of this section involving—

. . .

(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of—

(I) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(II) cocaine, its salts, optical and geometric isomers, and salts of isomers;

(III) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(IV) any compound or mixture, or preparation which contains any quantity of any of the substances referred to in subclauses (I) through (III);

(iii) 50 grams or more of a mixture or substance described in clause (ii) which contains cocaine base;

. . .

such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life . . ., a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,000 if the defendant is an individual . . ., or both. . . .

21 U.S.C. § 841.

The next part of this statute provides for a sentence of 5 to 40 years and a $2,000,000 fine for 500 grams or more of similarly described substances. 21 U.S.C. § 841(b)(1)(B).

The charges in Counts I and II of the indictment in this case refer both to § 841 (quoted above), which is part of Subchapter I–Control and Enforcement, and to sections of Subchapter II–Import and Export. The sections quoted immediately below appear in Subchapter II.

(a) **Unlawful acts**

Any person who—

(1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance,

(2) contrary to section 955 of this title, knowingly or intentionally brings or possesses on board a vessel, aircraft, or vehicle a controlled substance, or

(3) contrary to section 959 of this title, manufactures, possesses with intent to distribute, or distributes a controlled substance,

shall be punished as provided in subsection (b) of this section.

**(b) Penalties**

(1) In the case of a violation of subsection (a) of this section involving—

. . .

(B) 5 kilograms or more of a mixture or substance containing a detectable amount of—

(i) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(ii) cocaine, its salts, optical and geometric isomers, and salts or isomers;

(iii) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(iv) any compound, mixture, or preparation which contains any quantity of any of the substances referred to i clauses (i) through (iii);

(C) 50 grams or more of a mixture or substance described in subparagraph (B) which contains cocaine base;

. . .

the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than 20 years and not more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $4,000,-000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, or both.

. . .

(2) In the case of a violation of subsection (a) of this section involving

. . .

(B) 500 grams or more of a mixture or substance containing a detectable amount of—

(i) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

(ii) cocaine, its salts, optical and geometric isomers, and salts or isomers;

(iii) ecgonine, its derivatives, their salts, isomers, and salts of isomers; or

(iv) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in clauses (i) through (iii);

(C) 5 grams or more of a mixture or substance described in subparagraph (B) which contains cocaine base;

. . .

the person committing such violation shall be sentenced to a term of imprisonment of not less than 5 years and not more than 40 years. . . .

21 U.S.C. § 960.

**§ 963. Attempt and conspiracy**

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 963.

Title 28 U.S.C. § 991 of the United States Code authorizes establishment of the United States Sentencing Commission and declares:

**§ 991. United States Sentencing Commission; establishment and purposes**

(a) There is established as an independent commission in the judicial branch of the United States a United States Sentencing Commission. . . .

(b) The purposes of the United States Sentencing Commission are to—

(1) establish sentencing policies and practices for the Federal criminal justice system that—

(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;

(B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and

(C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process; and

(2) develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code.

28 U.S.C. § 991.

Duties and powers of the Commission are elaborated in 28 U.S.C. §§ 994, 995.

In the performance of its duties and in the exercise of its powers, the Sentencing Commission promulgated a DRUG QUANTITY TABLE, which appears in U.S.S.G. § 2D1.1(c), and includes the following entries, notes, and commentary:

(2)   ...   **Level 36**

+ At least 50 KG but less than 150 KG of Cocaine (or the equivalent amount of other Schedule I or II Stimulants);

...

+ At least 500 G but less than 1.5 KG of Cocaine Base;

...

(3)   ...   **Level 34**

+ At least 15 KG out less than 50 KG of Cocaine (or the equivalent amount of other Schedule I or II Stimulants);

+ At least 150 G but less than 500 G of Cocaine Base;

...

(7)   ...   **Level 26**

...

+ At least 500 G but less than 2 KG of Cocaine (or the equivalent amount of other Schedule I or II Stimulants);

+ At least 5 G but less than 20 G of Cocaine Base;

...

(11)   ...   **Level 18**

+ At least 100 G but less than 200 G of Cocaine (or the equivalent amount of other Schedule I or II Stimulants);

+ At least 1 G but less than 2 G of Cocaine Base;

...

(14)   ...   **Level 12**

...

+ Less than 25 G of Cocaine (or the equivalent amount of other Schedule I or II Stimulants);

+ Less than 250 MG of Cocaine Base;

...

*Notes to Drug Quantity Table:

(A) Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance. If a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level.

...

(D) "Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form.

. . .

### Commentary

Statutory Provisions: 21 U.S.C. §§ 841(a), (b)(1)—(3), 960(a), (b). For additional statutory provision(s), see Appendix A (Statutory Index).

Application Notes:

1. "Mixture or substance" as used in this guideline has the same meaning as in 21 U.S.C. § 841, except as expressly provided. Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used. Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax state, and waste water from an illicit laboratory used to manufacture a controlled substance. If such material cannot readily be separated from the mixture or substance that appropriately is counted in the Drug Quantity Table, the court may use any reasonable method to approximate the weight of the mixture or substance to be counted. . . .

. . .

5. Any reference to a particular controlled substance in these guidelines includes all salts, isomers, and all salts of isomers. Any reference to cocaine includes ecgonine and coca leaves, except extracts of coca leaves from which cocaine and ecgonine have been removed.

. . .

7. Where a mandatory (statutory) minimum sentence applies, this mandatory minimum sentence may be "waived" and a lower sentence imposed (including a sentence below the applicable guideline range), . . . by reason of a defendant's "substantial assistance in the investigation or prosecution of another person who has committed an offense." . . . In addition, 18 U.S.C. § 3553(f) provides an exception to the applicability of mandatory minimum sentences in certain cases. See § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases).

. . .

10. The Commission has used the sentences provided in, and equivalences derived from, the statute (21 U.S.C. § 841(b)(1)), as the primary basis for guideline sentences. . . . The Drug Equivalency Tables set forth below provide conversion factors for other substances, which the Drug Quantity Table refers to as "equivalents" of these drugs . . . .

. . .

### Drug Equivalency Tables

Schedule I or II Opiates*

. . .

Cocaine and Other Schedule I and II Stimulants (and their immediate precursors)*

| | | |
|---|---|---|
| 1 gm of Cocaine | = | 200 gm of marihuana |

. . .

| | | |
|---|---|---|
| 1 gm of Cocaine Base ("Crack") | = | [20,000 gm] 20 kg of marihuana |

. . .

*Provided, that the minimum offense level from the Drug Quantity Table for any of these controlled substances individually, or in combination with another controlled substance, is level 12.

. . .

Measurement Conversion Table

| | | |
|---|---|---|
| 1 oz | = | 28.35 gm |
| 1 lb | = | 453.6 gm |
| 1 lb | = | 0.4536 kg |
| . . . | | |
| 1 qt | = | 0.946 liters |
| 1 gm | = | 1 ml (liquid) |

. . .

. . .

12. Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

*If the offense involved both a substantive drug offense and an attempt or conspiracy (e.g., sale of five grams of heroin and an attempt to sell an additional ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense.*

*In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. For example, a defendant agrees to sell 500 grams of cocaine, the transaction is completed by the delivery of the controlled substance—actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered more accurately reflects the scale of the offense. In contrast, in a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant. If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.*

. . .

*18. For purposes of the guidelines, a "plant" is an organism having leaves and a readily observable root formation (e.g., a marihuana cutting having roots, a rootball, or root hairs is a marihuana plant).*

United States Sentencing Commission, *Guidelines Manual,* § 2D1.1(c) (Nov.1995).

### V.

Taken together and treated as a whole, the statutory provisions quoted in Part IV of this opinion manifest, at the least, the following statutory determinations and directives:

(a) A determination (commonly called a "finding of legislative fact") that a serious and distinctive problem of a special kind of drug abuse exists in many communities scattered throughout the United States.

(b) A determination ("finding of legislative fact") that a major and probably predominant circumstance giving rise to this distinctive problem is the marketing and use of derivatives of cocaine that are susceptible of use in ways different from common uses of cocaine in common powder form that involve ingestion by inhalation of powder through the nostrils or injection of powder in solution through veins.

(c) A determination ("finding of legislative fact") that an unresolved dispute exists among those best qualified by training and experience to provide reasonably reliable opinions concerning any physiological and psychological explanations of the observed differences in human behavior on which the finding of a distinctive community problem are based.

(d) A determination ("finding of legislative fact" or perhaps "premise" that is not, strictly speaking, "factual" in nature but more in the nature of an assessment of likelihood or probability) that in these circumstances, the harsh reality is that, on the available evidence, no finding of "fact" can be made, even by a preponderance of the evidence, much less with reasonable certainty, as to precisely how much more dangerous than the common powder form these various derivative forms of cocaine are to community interests and to individual persons.

(e) A determination ("finding of legislative fact" or perhaps "premise" that is not, strictly speaking "factual" in nature but more in the nature of an assessment of likelihood or probability) that the speed of effects on a person of the common powder forms of cocaine is limited by the time required for natural body processes to absorb and respond to the "stimulant," as statutory provisions designate cocaine to be.

(f) A determination ("finding of legislative fact" or perhaps "premise" that is not, strictly speaking "factual in nature" but more in the nature of an assessment of likelihood or

probability) that a key difference between cocaine in common powder form and in various derivative forms contributing to the distinctive new problem is that the recently marketed derivative forms are susceptible (as the common powder form was not) to ingestion in ways different from those in common use of powder forms. For example, the most common use of the various forms of cocaine base is smoking and inhalation of the vaporized "stimulant," that causes both quicker and more intensive effects of stimulus upon ingestion, followed by depression when the stimulus subsides.

These determinations have decisive impact on the mixed-legal-factual nature of the issues presented for decision in this case.

Defense counsel argues as her primary contention that this court must make an independent finding of the "scientific" meaning of "crack" cocaine, rather than trying to determine the meanings as manifested in the legislation itself for the words and terms such as "cocaine," "cocaine base," and "crack" as they are used throughout the statutory provisions quoted in Part IV of this opinion. In part at least, the argument is that this court (and higher courts on appeal) must make this scientific finding in order to determine whether the Legislative Branch and the President of the United States (in signing the legislation) have exceeded their constitutional authority.

Government counsel, as their primary response, ask this court to make precisely the opposite independent finding.

The fact that opposing counsel, as their primary positions, advocate these opposite extremes is not at all surprising. Quite understandably, they may be concerned that failure to assert these positions forcefully in the trial court would come back to haunt them in some way on appeal.

■ For a court to adopt either of these extremes, however, would be fundamentally inconsistent with the court's obligation of respect for manifested statutory directives. Taken as a whole, as explained above, the statutory provisions manifest legislative determinations of the existence of a distinctive and serious problem that creates a need for an immediate lawmaking response rather than a response deterred until a time, if ever such a time will come, when a "scientific" definition of "crack" could be formulated.

In these circumstances, fidelity to the judicial role in our constitutional structure of separation of powers requires that the court turn first to the legislation itself in search of manifestations of the meaning of words and phrases used in the legislation. This broad principle is amply supported in precedent. A single recent example, also involving alleged distribution of controlled substances, is sufficient to underscore the point. Courts of Appeals have differed sharply on the meaning of "carry" as used in relation to "carrying" a firearm while engaged in prohibited distribution of controlled substances. In fully exploring the conflict among precedents, an opinion of the Court of Appeals for the First Circuit takes account of the many different definitions of "carry" to be found in dictionaries and in common usages. The opinion then closely parses provisions of the legislation itself to arrive at a meaning (to be applied to the case before the court) that is compatible with statutory provisions and, as well, legislative history. The purpose was to decide whether a defendant, "during and in relation to any crime of violence or drug trafficking crime ... use[d] or carrie[d] a firearm," as that phrase is used in 18 U.S.C. § 924(c)(1). *United States v. Cleveland,* 106 F.3d 1056, 1064–68 (1st Cir.1997), (affirming trial court finding against defendant).

In relation to the present case, the statutory provisions regarding "coca leaves" (followed by an "except" clause), regarding "cocaine" (followed by "its salts, optical and geometric isomers, and salts of isomers"), and regarding "ecgonine" (followed by "its derivatives, their salts, isomers,and salts of isomers") manifest both an awareness of scientific learning and terminology and an intent that the legislation:

(a) exclude from statutory prohibitions extracts of coca leaves from which all stimulants have been removed,

(b) include in statutory prohibitions mixtures or substances that are derivatives of

coca leaves and still retain a detectable amount of stimulant,

(c) include optical and geometric isomers and salts of isomers of cocaine, and

(d) include ecgonine and its derivatives, salts, isomers, and salts of isomers, however produced.

The text of all the statutory provisions, taken together and interpreted as a whole, will not bear a narrower or more restrictive "scientifically" demonstrable meaning such as defendant proposes. Once this point is accepted, defendant's principal contention fails unless legislation of this meaning will not pass constitutional muster.

The foregoing points establish only that legislation prohibiting or regulating distribution of derivatives of cocaine is constitutionally permissible. Standing alone, they do not establish that legislation may draw a bright-line contrast that treats "crack" as having 100 times greater significance than common powder forms of cocaine for sentencing purposes.

A starting point for considering defense arguments challenging a lawmaker's use of any bright-line separation drawn somewhere along a spectrum of shadings of difference is recognition that the authority of *other lawmakers* (especially in enacting legislation) to make lawmaking choices of such a bright-line of separation along a spectrum is far greater than that *of courts.* For example, dollar limits (or "caps") on compensatory or punitive awards, or on scope of an immunity or some other form of protection against legal accountability, are far more likely to survive constitutional challenge when enacted in legislation than when proposed as the basis for a court decision accommodating conflicting high-value interests without entirely sacrificing one to the other when they clash.

It does not follow that such a bright-line separation in legislation as dramatic as the 100–to–1 contrast between "crack" and powdered cocaine will survive every constitutional challenge. I conclude, however, that the case now before this court does not require further consideration of this potential constitutional issue because other circumstances of this case reduce the contrast to a level far below the 100–to–1 ratio.

First, the applicability of 18 U.S.C. § 3553(f) and the Guidelines provisions implementing it (*see* U.S.S.G. § 5C1.2) make the statutory mandatory minimum sentences for distributing either "crack" or "cocaine" in any other form inapplicable here, thus reducing the lower end of the guideline range to whatever it turns out to be rather than a somewhat higher mandatory minimum.

Second, as will be explained later in this opinion, other authorized (and to some extent encouraged) grounds of downward departure apply here (under this court's findings on the record before the court in the sentencing hearing) and reduce the contrast to a point that, I conclude, leaves no valid basis for constitutional challenge. In these circumstances, I abstain from further consideration of a *constitutional* challenge to the "crack-powder-cocaine" contrast.

Remaining for consideration is the effect of the absence of compelling evidence for any clear and precise definition of either "crack" or "cocaine base." This absence of compelling evidence for any precise definition may seem surprising, especially after parties have had a full opportunity to present all evidence available to them bearing on the meaning of "cocaine," "cocaine base," and "crack."

On reflection it is less surprising, however, and especially after one takes account of findings in the report of the study of the "crack-cocaine" problem by the United States Sentencing Commission. Excerpts from the Commission's Summary of its Report help to explain the difficulty of arriving at a very precise definition that is also consistent with the legislative purpose of addressing the distinctive problem colloquially referred to, both "on the street" and in public debates, in Congress and elsewhere, about what steps are likely to be effective means of addressing the "crack cocaine" problem. These are fundamentally public policy choices lawmakers face. They are choices that our constitutional structure of separation of powers commits to Congress and the President initially, and to the court only when a court must answer a question about manifested meaning of legislation that must

be answered to decide a case pending in the court. Here are some key excerpts from the Commission's Report:

C. SUMMARY

As discussed above, a review of the relatively sparse empirical evidence available concerning those factors Congress considered in distinguishing crack from powder cocaine leads to mixed conclusions and few clear answers. Nevertheless, the Commission concludes that a policymaker could infer that crack cocaine poses greater harms to society than does powder cocaine. For example, because smoking crack cocaine lends itself to binge use in a way not found with snorting powder—the most popular way of administering that form of the drug—crack has a greater potential for creating dependency. Moreover, the ease by which crack can be administered and its ability to be marketed cheaply have made it particularly appealing and accessible to a broader population, including some of the most vulnerable members of society: the poor and the young. Further, both forms of cocaine appear to be associated with systemic violence, that is, violence associated with the marketing of a drug; however, crack dealers generally, tend to have a stronger association with systemic violence and are more likely to possess weapons than powder cocaine dealers. Finally, crack dealers, generally, have more extensive criminal records than other drug dealers, and they tend to use young people to distribute the drug at an increased rate.

A conclusion that crack cocaine poses somewhat greater harm to society, however, does not answer the question whether the 100–to–1 quantity ratio between powder and crack cocaine is one that this Commission would recommend. In addressing that question, the Commission notes that there is no precise method by which one can determine the optimal penalty differential between drugs or even between kinds of offenses. While medical and pharmacological research can calibrate closely the appropriate amount of medication necessary to treat an illness, there is no comparable test to identify the appropriate punishment level for the illegal sale of a controlled substance. Instead, in es-

tablishing a penalty level for trafficking in a particular drug, the policymaker must weigh pharmacological evidence and the other societal harms posed by the substance to arrive at a sound penalty level.

Accordingly, even while agreeing that crack may be more harmful than powder cocaine, the Commission is not prepared at this time to say definitely how that additional harm should be accounted for within the current penalty scheme. Indeed, for reasons discussed below, the Commission will not recommend in this report a particular ratio or ratios or a particular structure that it can endorse. Nevertheless, the Commission firmly concludes that it cannot recommend a ratio differential as great as the current 100–to–1 quantity ratio.

United States Sentencing Commission, Cocaine and Federal Sentencing Policy at 195–96 (Special Report to the Congress, Feb. 1995).

These findings of the Commission have a potential bearing on issues in this case in several ways.

First, they represent considered views of an independent commission that statutory provisions include mandates that both the Commission and the courts must respect.

Second, they underscore the policymaking implications of any decision made by any lawmaker about definitions distinguishing among "cocaine," "crack," and "cocaine base" for purposes of criminal sentencing.

Third, they underscore the absence of evidence to support a finding that some cadre of scientists in some identifiable field of scientific learning has developed definitions (a) distinguishing among these terms, or (b) identifying scientifically demonstrable facts to which these labels might be applied.

The Commissioner's report and findings, of course, do not purport to be law. It is a report to Congress, with recommendations. Congress has not chosen to approve and act according to the recommendations. This fact is further confirmation of the point that the Legislative Branch continues to manifest a public policy choice that sentencing decisions

should be materially affected by taking account of a distinction among different forms of cocaine and its derivatives.

These conclusions are consistent, I believe, not only with statutory mandates, expressed and implicit, and the Sentencing Commission's Report and its promulgated Guidelines, but also with First Circuit precedents most nearly on point.

Defendant's contention that any legislative distinction between "crack" and "cocaine" for sentencing purposes is insupportable clashes with the reasoning of First Circuit opinions. It might be said that the precise issue in each of those cases was somewhat different from each of the issues presented in the sentencing decision under consideration. Even so, district courts within the circuit must respect the reasoning as well as the judgment in each First Circuit decision, including relevant statements about the meanings of "cocaine," "cocaine hydrochloride," "cocaine base," and "crack." Even though an opinion may be read as focusing on meaning in a context distinguishable from the circumstances presented by the present sentencing context, I read them as at least somewhat incompatible with the defense contention here. *See, e.g., United States v. Singleterry,* 29 F.3d 733, 739–40 (1st Cir.1994) (rejecting Singleterry's contention "that a distinction between cocaine base and cocaine powder" is "an irrational classification ... violative of the equal protection component of the Fifth Amendment's Due Process Clause"); *United States v. Camilo,* 71 F.3d 984, 990 (1st Cir.1995) ("In *Singleterry,* we concluded that health effects notwithstanding, crack in reality does differ from cocaine powder, not least importantly because its cheaper unit price could radically increase drug use absent stiffer penalties for crack distributors. (Citing *Singleterry.*) The similar medical effects from crack and cocaine powder do not compel a finding of legal ambiguity [invoking a 'rule of lenity'], especially where there is evidence of differing effects in society.").

Defendant Fulton urges that her challenge to constitutionality on grounds of vagueness is different from any previously adjudicated in the First Circuit. She emphasizes an alleged lack of the kind of precision in the statutes and the guidelines that would tell a competent laboratory technician what scientific tests to use in determining whether a substance is "crack." Even if this challenge is in some ways different and perhaps subtler than the challenges rejected in *Singleterry* and *Camilo,* however, I conclude that I would be departing from the sense of those opinions were I to sustain Fulton's challenge of vagueness.

Fulton's contention for invoking a rule of "lenity" is inconsistent, also, with the explanation of that rule in another context by the opinion of the Supreme Court in *United States v. Wells,* —— U.S. ——, ——, 117 S.Ct. 921, 931, 137 L.Ed.2d 107 (1997) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended.") (citations, ellipses, and internal quotation marks omitted).

## VI.

The expert witnesses in this case, in expressing opinions as to whether the substances seized from defendant Fulton at Logan Airport on July 16, 1995, contained detectable quantities of either "cocaine base" or "crack" did not purport to use, for their respective clashing meanings of these terms, definitions appearing in any statutory provision. *See* Affidavit of Damian P. Farley, ¶¶ 4, 5; Affidavit of Steven L. Hoenig, ¶¶ 2 n. 1, 3.3, n. 2, 4–7; Supplemental Affidavit of Steven L. Hoenig, ¶¶ 3, 4; Affidavit of Patrick Demers, ¶¶ 2–5; oral testimony of Steven L. Hoenig, Transcript, Day 1 (Docket No. 130), pp. 1–11 through 1–42; oral testimony of Damian P. Farley, Transcript, Day 2 (Docket No. 147), pp. 2–8 through 2–132.

■ To be useful to a court that must respect manifestations of the meanings of words used in a particular statutory context, an expert opinion must necessarily be an opinion on a mixed-legal-factual issue. Because the expressed opinions of the witnesses did not include either any recitation or any implicit disclosure of a legal premise even purporting to be consistent with statutory

manifestations of meaning, these opinions of witnesses are not persuasive to the court, acting as finder of fact.

■ Defendant argues that the exhibits in evidence are not "crack" as defined in U.S.S.G. § 2D1.1(c), Notes to Drug Quantity Table, (D), because a substance produced by chemical synthesis is not "crack" unless sodium bicarbonate is used in the processing and chemical analysis in a government laboratory did not detect any trace of "sodium bicarbonate." The definition in Note (D), however, does not support the premise of this contention. It says

> "Crack" is the street name for a form of cocaine base, *usually* prepared by processing cocaine hydrochloride and sodium bicarbonate, and *usually* appearing in a lumpy, rocklike form.

*Id.* (emphasis added). Defendant's contention strips "usually" of any meaning. Moreover, I credit the oral testimony before the court to the effect that any other chemical compound described as *"base"* in contrast with *acid* (or *"basic"* in contrast with *"acidic,"* a term commonly used to describe cocaine hydrochloride) serves the same function as sodium bicarbonate in the chemical transformation of cocaine hydrochloride into "cocaine *base."* The low cost and ready availability of sodium bicarbonate on the market (so one can buy without risk of drawing attention and creating suspicions, as might occur when buying less common *base* chemicals) makes it the compound of choice. This accounts for the fact that sodium bicarbonate is "usually" the form of *base* that a person engaged in preparation of the substance for illicit marketing uses.

As finder of fact in this proceeding, the court was able to observe in the exhibits before the court quantities of substances that appeared to the naked eye to be powder, and almost white, along with other quantities of substances that had a distinctly granular and non-powdery appearance to the naked eye. Credible evidence before the court indicated that even the substances appearing to the naked eye to be powdery and almost white appeared, under magnification, different both in color and in form. It is true that, under observation with the naked eye, the substance in the exhibits was not in lumps or chunks large enough to be literally "rocklike," as the term "rock" and the phrase "rocklike" would connote in ordinary usage. That evident truth, however, is not decisive of any material issue in this case. Without doubt, a substance that in one stage of preparation is in a rocklike form may also be in such large lumps that no lump could be placed in a pipe for smoking. A lump that large must be broken or crushed into smaller pieces to be suitable for placement in a pipe for smoking. When so crushed, however, it does not cease to be "crack" or "cocaine base," even if it is crushed so thoroughly that to the naked eye it appears powdery.

Counsel have called attention to precedents from other circuits that may be read as supporting meanings for "crack" and "cocaine base" more favorable to the defendant than those explained in this opinion. *See, e.q., United States v. James,* 78 F.3d 851, 858 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 128, 136 L.Ed.2d 77 (1996); *United States v. Munoz–Realpe,* 21 F.3d 375 (11th Cir.1994). I am not persuaded that the First Circuit would follow these precedents and also rule that they apply in this case, which is very different from the cited cases on the facts, as fully explained in this opinion. It is true that the opinion in *James* adopts the view expressed in *Munoz–Realpe* that "other forms of cocaine that are not crack should not be treated as cocaine for sentencing purposes." *James,* 78 F.3d at 858 (citing *Munoz–Realpe,* 21 F.3d at 377). And the opinion in *James* adds: "The Government failed to prove by a preponderance of the evidence that the form of *cocaine base* James sold was actually crack." *James,* 78 F.3d at 858 (emphasis added). My decision does not rest on an assumption, which would conflict with *James,* that all "cocaine base" is "crack." But I do find, on the record before me, that the exhibits in this case included detectable amounts of "crack."

Also, defendant contends that a decision in this circuit, *United States v. Lopez–Gil,* 965 F.2d 1124 (1st Cir.1992), is on point. I conclude the contrary, again for the reason that the government in that case failed to prove that the "cocaine base" material transported

was "crack," the government expert witness having explicitly responded to the trial court's question whether it was "crack" with the answer, "It was not crack." 965 F.2d at 1129. On the record before me, I find that a detectable amount of "crack" was in the substances transported by defendant Fulton.

Taking into account the oral testimony of the witnesses at the evidentiary hearing along with the entire record before me, I find that the clashing opinions of the witnesses as to whether substances taken from the defendant at Logan Airport on July 16, 1995, included detectable amounts of "crack" were, as to each expert, based on a premise chosen by that expert as to the definition of "crack" that made that expert's expressed opinion inevitable, quite apart from physical characteristics of the seized substances that were observable to the court and, as shown by credible evidence before the court, quite apart from the chemical properties that were demonstrable by testing.

A court's acceptance of any of these premise-foreordained opinions as controlling would be an abandonment of the court's obligation to respect the legislative manifestations, in the text of the legislation itself, of a more pragmatically based definition responsive to the community problem the legislation addresses.

█ I find that the substances taken from the defendant at Logan Airport included detectable amounts of "crack" as defined in the legislation, and detectable amounts of "cocaine base" as defined by the legislation, and that I need not determine whether or not "cocaine base" and "crack" are synonymous. These two terms have meanings closely similar if not precisely synonymous, and the substance in evidence in this hearing was one within the large area of overlapping meaning of these terms if they are not precisely synonymous. I assume, without deciding, that if the label "cocaine base" is assigned by some chemists to a substance that would not be susceptible of use through smoking to produce quick and intensive stimulation, it would not be "crack" as that term is used in relation to federal criminal sentencing.

I find that "crack" is commonly, though not invariably, used as a "street name," and

is also used in the law relating to federal criminal sentencing, to mean a form of derivative from coca leaves or a form of independently laboratory-generated chemical compound that produces quick effects of stimulation and quicker and deeper effects of depression when the stimulation passes than are realized from common uses of cocaine powder.

The findings recited in this opinion, including those recited in Part VII below, I conclude, are enough to support the decision that the outcome determined here is consistent with legislative directives and not offensive to constitutional constraints.

## VII.

I find on the record before me that neither in this record, nor in the congressional record to which courts may look for whatever appropriate guidance they may find in legislative history, is a precise finding made about how the label "crack" came into wide common usage in metropolitan communities generally and in public and legislative debates over the distinctive crack cocaine problem identified at the beginning of this opinion, or about the precise definition of the term.

In these circumstances, courts are in no position to make an independent determination of the meaning of "crack" and "cocaine base" rather than applying their determination of the meaning manifested in the text of the legislation as a whole, as explained in Parts IV and V of this opinion. That manifested meaning, as far as it is ascertainable, is the meaning this opinion aims to apply in order to decide the precise sentencing issues before the court.

Fortunately, these precise sentencing issues, as they involve the "crack-cocaine-base-cocaine" problem, are considerably narrowed in scope and consequence by other issues that deserve emphasis at this point.

█ As a preface to explaining these matters bearing emphasis, I state a finding that, had it gone the other way, might have alleviated the problem even more, but it is a fact. I find, by a preponderance of the evidence, over defendant Fulton's contention to the

contrary, that defendant Fulton had sufficient knowledge of the acts of her co-defendants that she could reasonably be expected to know that controlled substances of the same nature as those she was transporting to Logan Airport inside her body were being transported in like quantities by co-defendants in their bodies as part of the conspiracy of which she was a member. Also, I conclude that knowledge that it was "crack" or "cocaine base" rather than some other form of "cocaine" is not required in this context. I do not find, however, that she knew or could be expected to foresee the precise quantities transported by them, or that those quantities, added to the quantities she transported, would produce a sum of 500 G or more.

■ When making findings under a preponderance of the evidence standard about quantities (whether quantities of controlled substances, or quantities determining a restitutional obligation, or quantities of foreseeable "loss" or "value" with respect to, for example, stock in a corporate entity or bank "checks" or "credits"), the finder of facts may evaluate the evidence as insufficient to support a finding of any precise quantity and yet sufficient to support a finding that it is. more probable than not that the quantity was more than some particular numerical minimum in a prescribed "level" of a guideline sentencing table. Defendant Fulton persuades me as finder of fact that by reason of a substantial likelihood that the extrapolation from weighing of separated "pure cocaine base" in samples, as occurred in the government laboratory examination (rather than weighing of separated "pure cocaine base" in the entire quantities seized), the precisely stated quantities of "pure cocaine base" are almost certainly not precisely correct and may as likely be too high as too low. Added to other possibilities, such as contamination of the samples examined either before or during the laboratory procedures, these uncertainties lead me to decide that I cannot find that more probably than not the amount of cocaine base was 500 G or more. After taking into account the cumulative weight of all these challenges, however, I find with confidence that it is more probable than not that the amount of cocaine base was not less

than 150 G. Level 34 of the Drug Quantity Table applies to this case.

■ In summary, I find by a preponderance of the evidence that the amount for which Fulton is accountable—the amount carried by Fulton herself plus the amounts transported by the co-defendants for whose transported quantities she is accountable as known or reasonably foreseeable to her—is "at least 150 G but less than 500 G of Cocaine Base" and that Level 34 of the DRUG QUANTITY TABLE applies.

This finding changes the Offense Level Computation in paragraphs (28)—(37) of the PSR from a Base Offense Level of 36 and a Total Offense Level of 27 to the following:

| | |
|---|---|
| Base Offense Level | 34 |
| Specific Offense Characteristics | –2 |
| Adjustment for Role in Offense | –4 |
| Victim Related Adjustment | 0 |
| Adjustment for Obstruction of Justice | 0 |
| Adjusted Offense Level | 28 |
| Adjustment for Acceptance of Responsibility | –3 |
| TOTAL OFFENSE LEVEL | 25 |

The Guideline range for Total Offense Level 25 and Criminal History Category I is 57–71 months.

Defendant Fulton will be entitled to challenge on appeal my finding that the substance for which she is accountable was "crack." In order to avoid a possible necessity for remand for further findings should a higher court sustain her contention, I proceed to consider defendant Fulton's contention that the TOTAL OFFENSE LEVEL would be 17 if the substance was "cocaine." In that event, my finding as to the amount of cocaine for which she is responsible would be, as Fulton contends, "at least 500 G but less than 2 KG" and Level 26 of the Drug Quantity Table would apply. All adjustments would remain the same as shown in the tabulation above, and the TOTAL OFFENSE LEVEL would be 17 (8 points lower because the Base Offense Level is 26 rather than 34).

Moving down to Level 24 would not aid Fulton because U.S.S.G. § 2D1.1(b)(4) would then deprive her of the 2–point downward adjustment for the "specific offense characteristic" associated with § 5C1.2.

(4) If the defendant meets the criteria set forth in subdivisions (1)—(5) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases) and the offense level determined above is level 26 or greater, decrease by 2 levels.

United States Sentencing Commission, *Guidelines Manual,* § 2D1.1(b)(4) (Nov. 1995). The five criteria of U.S.S.G. § 5C1.2 are not repeated here; they are the same as those stated in the "escape valve" statute, quoted on pages 484–485, above.

Moving even as far down as Level 18 would not aid Fulton materially because she would lose not only the 2–point downward adjustment under the "escape valve" but also another point of the 3–point downward adjustment for acceptance of responsibility. Only a 2–point adjustment is available if the OFFENSE LEVEL as calculated before the downward adjustment for acceptance of responsibility is 15 or below—that is, not "level 16 or greater." U.S.S.G. § 3E1.1(b).

Only if the reasons for downward departure would cause the court, in the exercise of discretion, to depart to a sentence commensurate with a lower level than when departing downward from TOTAL OFFENSE LEVEL 25 would this make a difference in the sentence imposed.

Turning to grounds of downward departure I find that the defendant satisfies all five criteria of U.S.S.G. § 5C1.2. Thus, the statutory minimum sentence of 60 months that would otherwise apply does not apply, and the minimum sentence under the Guidelines is therefore 57 months at TOTAL OFFENSE LEVEL 25.

I find also that the offenses of which this defendant has been found guilty are not within the heartland of convictions under similar charges. On the independent grounds described below, and for the more compelling reason of the combination in this case of these separate kinds of circumstances warranting downward departure in appropriate cases, I find that a downward departure is authorized in this case.

First, defendant was suffering from diminished mental capacity deriving from vulnerability traceable in part to childhood abuse and in part to more recent traumatic experiences. This I assume to be a discouraged ground of departure under the framework of analysis prescribed in *United States v. Rivera,* 994 F.2d 942 (1st Cir.1993), but nevertheless authorized upon appropriate findings of exceptional circumstances. I find the combination of circumstances in this case exceptional to an extraordinary degree that distinguishes this case from the "heartland" cases covered by circumstances adequately considered by the Commission and for which the Guidelines adequately prescribe. *See* U.S.S.G. § 5K2.0 and Commentary.

Second, the defendant's conduct was aberrant in the sense that qualifies for downward departure under *United States v. Grandmaison,* 77 F.3d 555 (1st Cir.1996). Defendant Fulton is a first offender, and the evidence before the court strongly supports a finding that she was exceptionally vulnerable to pressure and inducements persistently thrust upon her to accede to the proposal that she take a trip, even though it was to a resort area, on conditions so adverse that a reasonable, nonvulnerable person would not have assented. She was emotionally overpowered in circumstances of extreme vulnerability. Her conduct was aberrant.

In addition to the grounds found above to warrant downward departure in this case, defendant Fulton asserts several other grounds that I conclude are appropriately considered as part of the totality of the circumstances bearing on the scope and degree of departure under the *Grandmaison* totality-of-the-circumstances standard, even if each of them standing alone might not have been sufficient to cause the court to order a downward departure in the exercise of discretion authorized under the Guidelines system of sentencing.

Fulton contends that she lacked knowledge of the nature of even the substance she was transporting, as well as lacking knowledge both of the nature and quantity of substances transported by others, and that this should be a ground for downward departure even if the court holds her accountable under a foreseeability standard. In the exercise of discretion, I give this asserted ground no weight

in the sentencing determination. I cannot say that this is a factor or circumstance not adequately considered by the Sentencing Commission. The lack of explicit rejection of such a contention in the text of the Guidelines is not significant. The contention is in its nature inconsistent with the sentencing objectives served by explicitly rejecting proof of knowledge as a basis for accountability and explicitly declaring accountability for quantities reasonably to be expected as within the scope of the conspiracy that a member chose to join.

Fulton contends also the circumstances of her participation in the conspiracy charged involved duress. I do not find duress, however, in any sense beyond that referred to elsewhere in this opinion as dramatically adverse family and economic circumstances that made her vulnerable to pressure.

Other contentions advanced by Fulton have more weight in her favor. I find that she was functioning under a diminished mental ability, relevant under § 5K2.13 as an encouraged ground of departure in appropriate circumstances, as a result of dramatically adverse conditions of her childhood and severe family circumstances. These circumstances included lack of any participation by the respective fathers of her two children in providing for or caring for the children or Fulton as their primary caretaker, Fulton's lack of success in maintaining employment that would produce adequate income to care for herself and her children, and her inability to cope with family responsibilities falling upon her because of these circumstances and her personal sense of commitment to the children.

■ In the exercise of discretion, taking account of this combination of circumstances, I find it appropriate to depart downward to a sentence consistent with Total Offense Level 12 and Criminal History Category I (10 to 16 months imprisonment).

Remaining to be decided is whether a departure to a lower TOTAL OFFENSE LEVEL would be appropriate if the BASE OFFENSE LEVEL was 17 rather than 25, as explained on page 496, *supra* (or 12 rather than 25, as explained on page 498, *supra* ). Weighing in favor of departure to a lower level is the 8–point (or 13–point) difference in the level from which the departure is to be made. Weighing against departure to a lower level is the fact that the offense involves distribution of a Schedule II controlled substance, which is a matter of grave concern to the community. Regardless of the strength of grounds for departure in a particular case, the community's interest in a sentence that at least has admonitory and deterrent characteristics consistent with the gravity of the community interest, weighs heavily against downward departure to straight probation without even a condition of home confinement for some period of time.

### VIII.

I conclude that it is appropriate to make a downward departure to a sentence consistent with a Total Offense Level of 12.

The sentence determined at the sentencing hearing concluded on this date is 60 months probation, special assessments of $50 on each of Counts I–III for a total of $150, no fine because of lack of resources, a special condition of 6–months home confinement without electronic monitoring but with random telephone monitoring, and provisions for release for work, counseling, obtaining necessities for the defendant and her children (including medical attention), and attending religious services, as well as other appropriate standard and special conditions specified at the sentencing hearing.