**UNITED STATES of America, Plaintiff,**

v.

**Jackie JOHNSON, Defendant.**

**Crim. Action No. 96–45 MMS.**

United States District Court,
D. Delaware.

Argued April 11, 1997.

Decided Aug. 13, 1997.

Robert J. Prettyman, Assistant United States Attorney, Department of Justice, Wilmington, DE, for plaintiff.

James S. Green, Linda J. Jennings, Duane, Morris & Heckscher, Wilmington, DE, for defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

On December 26, 1996, Jackie Johnson pled guilty to four charges of narcotics-related offenses. The only charge relevant for purposes of this opinion is Count I of the Information ("Count I"). Count I charged Johnson with Conspiracy to Distribute Cocaine and over 1.5 kilograms of Cocaine Base, a.k.a., "Crack," in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A).

As part of the plea agreement, Johnson conceded the amount of cocaine base attributable to him for purposes of Count I exceeded 1.5 kilograms. Johnson and the Government disagreed, however, on the nature of

the cocaine base involved in the offense. Specifically, the Government held the view that the cocaine base attributable to Johnson is, for sentencing purposes, crack cocaine. Johnson, on the other hand, denied the cocaine base is crack. The parties agreed a sentencing hearing was needed to settle this dispute. Johnson and the Government stipulated the nature of the cocaine base should be determined by "statements made by [Johnson] and ... any analyses of the cocaine base seized by law enforcement officers ... and any testimony in support of such analyses." Docket Item ("D.I.") 23 at ¶ 3.

The Court held an evidentiary hearing on April 11, 1997. For the reasons that follow, the Court holds the Government has not sustained its burden of proving the drugs charged in Count I are crack cocaine.

## II. FACTUAL BACKGROUND

### A. The Evidence Against Jackie Johnson

On April 25, 1996, the Wilmington office of the Drug Enforcement Administration ("DEA") arrested Jackie Johnson in New Castle, Delaware. When he was arrested, Johnson had in his pants pocket a small plastic bag containing an off-white rocky substance, later designated as DEA Exhibit 17. See Defense Exhibit ("DX") 4, 8. The DEA suspected this substance was crack cocaine.

In connection with its investigation and arrest of Johnson, the DEA executed two search warrants, both the day of Johnson's arrest. The first was executed at the apartment of Teiko Staton in New Castle, Delaware.[1] At Staton's apartment, DEA agents found a safe. In the safe was a white Foot Locker bag, which contained two clear plastic baggies. These two plastic baggies contained, in turn, thirty-five (35) smaller clear plastic baggies filled with an off-white rocky substance. See DX 1, 7. The fruits of this search were designated collectively as DEA Exhibit 20.

Special Agent William Lutz was the person who pried open the safe in Staton's apartment and seized DEA Exhibit 20. D.I. 37 at

108–09. Based on the off-white, round, and lumpy nature of the material found in the smaller plastic baggies, and based on his field experience and narcotics training with the DEA, Agent Lutz believed he was dealing with crack cocaine. D.I. 37 at 109, 112. As part of his training with the DEA, Lutz made crack cocaine by processing cocaine hydrochloride and sodium bicarbonate; the crack he made—though purer and closer to the color of white because it was produced in the pristine environment of a DEA laboratory—resembled the drugs found in the plastic baggies. D.I. 37 at 111. Further, Lutz testified one of the street names for the substance found in the plastic baggies was "crack." D.I. 37 at 111–12, 124.

Lutz handed the contents of the safe to Special Agent Eric Miller. Agent Miller then field-tested the drugs for the presence of cocaine, inventoried them, and apparently was responsible for their subsequent storage and transportation to the DEA forensic lab. See D.I. 37 at 113–16. The gross weight of Exhibit 20, measured when seized and submitted to the DEA forensic lab, was 1388 grams. DX 7.

Another search warrant was executed that same day at Johnson's residence in Dover, Delaware. This search revealed, among other things, a clear plastic bag containing an off-white chunky substance. The DEA subsequently designated this substance as DEA Exhibit 23. See DX 9.

The three exhibits—DEA Exhibits 17, 20, and 23—were sent to the DEA forensics lab in New York for testing. Before it was sent to the DEA forensics lab in New York, DEA Exhibit 20 was heat-sealed and described as consisting of "two ziplock plastic baggies [c]ontaining 35 smaller plastic Baggies with an off-white Rocky substance further contained in a white plastic foot locker bag." DX 7. DEA forensic chemist Victor Bravenec was responsible for testing the three exhibits. Upon inventorying DEA Exhibit 20, Bravenec initially found the two clear ziplock bags contained a total of *thirty-five* (35) smaller plastic baggies containing a white rock-like substance and one (1) smaller plastic bag containing white powder. D.I. 37 at

---

1. Separate narcotics charges were brought against Ms. Staton.

217. A later recount, however, revealed *thirty-eight* (38) baggies each containing a rock-like substance, and one (1) plastic bag containing white powder. *Id.* Bravenec also weighed Exhibit 20, which was 1,404 grams, or about sixteen (16) grams heavier than when it was weighed by the Wilmington DEA. D.I. 37 at 212.

So while the DEA purportedly sent only thirty-five (35) plastic baggies containing a rock-like substance to be tested, see DX 1, Bravenec apparently tested a total of thirty-nine (39) baggies—thirty-eight (38) baggies containing a rock-like substance, and one (1) baggie containing a white powder, *see* DX 5. Bravenec pooled the thirty-eight (38) bags into what he labeled DEA Exhibit 20A; this representative sample tested positive for sodium bicarbonate. D.I. 37 at 165. Bravenec also testified DEA Exhibit 20A was, in his opinion, crack cocaine. Upon cross-examination, however, he opined all cocaine base is crack, even after being informed of the Third Circuit Court of Appeals' ruling in *United States v. James*, 78 F.3d 851 (3d Cir.)., *cert. denied*, —— U.S. ——, 117 S.Ct. 128, 136 L.Ed.2d 77 (1996).[2] As the scientist put it, "I've always known that all cocaine base is crack . . . And that's what I still think." D.I. 37 at 214. Bravenec also admitted that, while they tested positive for cocaine base, neither DEA Exhibit 17, found on Johnson when he was arrested, nor DEA Exhibit 23, found in Johnson's residence the same day he was arrested, contained traces of sodium bicarbonate. D.I. 37 at 209.

At the evidentiary hearing, Johnson called John P. Morgan, M.D., a professor of pharmacology at the City University of New York Medical School, who has extensive training in the pharmacology of cocaine hydrochloride and cocaine base. *See* D.I. 37 at 167; DX 2. After reviewing Bravenec's notes indicating there was no sodium bicarbonate in either DEA Exhibit 17 or DEA Exhibit 23, Morgan concluded neither DEA Exhibit 17 nor DEA

Exhibit 23 were "crack" as defined in *James*. D.I. 37 at 175–76.

## B. Crack and the Sentencing Guidelines

In order to understand fully the resolution of this case, it is necessary to delve into two topics: (1) the dynamics of the domestic drug trade, specifically, cocaine trafficking; and (2) the Sentencing Guidelines. The Court's understanding on the first topic is based primarily on the testimony of Bravenec and Morgan and a special report submitted by the Sentencing Commission to the Congress. As will be demonstrated, this understanding shapes the Court's discussion of the second topic—the Sentencing Guidelines.

### 1. Cocaine: From plant to street

Cocaine, in its various usable forms, originates from a plant. The coca plant itself is not ordinarily smuggled into the United States, of course; first, the cocaine must be extracted from the coca leaves. This is typically done by mixing coca leaves with a base (such as sodium bicarbonate), an organic solvent (such as kerosene) and water. After this mixture is agitated, the cocaine alkaloid[3] and the organic solvent separate from the coca leaves and the water. The coca leaves and water are removed, and the remaining mixture is treated with an acid. This separates the kerosene from the cocaine alkaloid. Finally, more sodium bicarbonate is added, producing a "chunky, off-white to light-brown, putty-like substance." This substance, known as coca paste, is removed and dried.

According to the Sentencing Commission, coca paste is chemically similar to freebase cocaine and crack cocaine (two drugs that will be explored later in this opinion). The problem with coca paste—at least in the eyes of drug kingpins—is that it cannot readily be absorbed by water and thus cannot be injected, insufflated, or ingested. For this and other reasons, while coca paste enjoyed brief, episodic use in the United States in the

---

**2.** As will be discussed later in this opinion, the Third Circuit appellate court concluded in *James* there are forms of cocaine base other than crack for purposes of the Sentencing Guidelines.

**3.** Cocaine alkaloid is the active ingredient in all usable forms of cocaine processed from coca leaves. *See* UNITED STATES SENTENCING COMMISSION, SPECIAL REPORT TO THE CONGRESS COCAINE AND FEDERAL SENTENCING POLICY 9 (Feb. 1995).

1980's, coca paste is typically not imported into the United States.[4] *See* UNITED STATES SENTENCING COMMISSION, SPECIAL REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 11–12 (Feb. 1995). Morgan confirmed as much at the hearing: for various reasons, when cocaine is smuggled into the United States, it is invariably in the form of powder cocaine. D.I. 37 at 168, 171.

Thus, coca paste is not a highly visible culprit in the war against drugs. Instead, it is the product of "an intermediate step in the processing of coca leaves into cocaine hydrochloride," or, as it is more commonly known, powder cocaine. U.S.S.G. amend. 487. To obtain powder cocaine, coca paste is dissolved in hydrochloric acid and water. Potassium salt is added to the mixture; this causes unwanted substances to separate from the remaining solution. After these substances are discarded, ammonia is added. The ammonia causes a solid substance—the powder cocaine—to separate from the solution. Finally, the powder cocaine is readied for market: it is removed from the solution, dried, and diluted (or "cut") by the addition of one or more of an assortment of adulterants such as sugar, local anesthetics, other drugs, or other inert substances. Unlike coca paste, powder cocaine is readily absorbed into water, which means it can be injected, insufflated, or ingested. SPECIAL REPORT, *supra* at 12.

Powder cocaine cannot be smoked, however, and smoking cocaine both produces a more immediate "high" than ingesting or insufflating cocaine and is less painful and risky than injection.[5] SPECIAL REPORT, *supra* at 16–18. Powder cocaine is therefore often converted into cocaine base, which can only be smoked. One form of cocaine base is freebase cocaine. Freebase cocaine is made by dissolving powder cocaine in water and a strong alkaloid solution, typically ammonia. An organic solution such as ether is added, causing a solid substance to separate from the solution. This solid substance is a relatively pure form of cocaine base. Because the freebasing process requires some dexterity and is dangerous, however—ether is highly volatile and will ignite or explode if the freebase cocaine is smoked before the ether has entirely evaporated—many users resisted it. *See* SPECIAL REPORT, *supra* at 13. Instead, they turned in droves to another form of cocaine base, one that was cheap, simple to make, and relatively safe—crack cocaine. *See* D.I. 37 at 169, 173.

Crack cocaine is generally made by dissolving powder cocaine in water in a container, then adding a base. D.I. 37 at 151. Theoretically, the base can be anything so long as it has the core properties of a base—sodium bicarbonate, sodium hydroxide, potassium hydroxide, and ammonia are all examples of bases that can be used. *Id.* Morgan testified that in practice, however, sodium bicarbonate is the "most common" base "by far" used to make crack cocaine. D.I. 37 at 172. In fact, when pressed if crack was "always made on the street with sodium bicarbonate," Morgan responded, "[i]n my experience, yes." D.I. 37 at 173. This is so, explained Morgan, because sodium bicarbonate has the distinct advantages of being "[c]heap, easy, [and it] doesn't need to be cleaned up." *Id.*

The mixture of powder cocaine, water and a base (most likely sodium bicarbonate) is then heated, sometimes by microwave oven. D.I. 37 at 157. During heating, an oil forms at the top of the container. Once the oil forms, the heat source is removed and the container is cooled rapidly to room temperature or below. The oil begins to solidify and trap water as it cools. D.I. 37 at 151. The excess water is then removed, leaving a white, rocklike substance at the bottom of the container—crack cocaine. D.I. 37 at 157.

Only a certain amount of base (again, most often sodium bicarbonate) need be added to cocaine hydrochloride to produce crack. If no excess sodium bicarbonate is used, then no traces of sodium bicarbonate will be found

---

4. According to the Sentencing Commission, however, coca paste is smoked in cocaine-producing South American countries. SPECIAL REPORT, *supra* at 11.

5. Intravenous cocaine use poses a twin danger: (1) overdose, due to the unknown purity of street doses, and (2) infectious disease, due to the less-than-sterile conditions associated with illicit drug use. *See* SPECIAL REPORT, *supra* at 18.

in the resulting crack. D.I. 37 at 158. If crack is made under the conditions in which Agent Lutz made his crack as part of his training—that is, the "ideal conditions" of a "perfectly clean" and "very controlled" laboratory, D.I. 37 at 111—it is possible, theoretically, there will be no detectable traces of sodium bicarbonate in the crack.[6]

Trained chemists working in optimal conditions may, if skilled and lucky enough, process a sample of crack that contains no traces of sodium bicarbonate. Crack dealers working with microwave ovens or stovetops in squalid apartments, and with incentives to add too much sodium bicarbonate to ensure no cocaine hydrochloride is wasted, are extremely unlikely to achieve such success. Dr. Morgan's testimony is directly relevant on this point:

> Q: And in your experience, if crack is made by the addition of sodium bicarbonate to cocaine hydrochloride, will there be sodium bicarbonate residue in the resulting cocaine base?
>
> A. I believe the answer is yes. And a strong yes. Obviously, a million samples have not been analyzed. And I'll refer to Mr. Bravenec who is technically correct: *If you added the exact amount of sodium bicarbonate, it would be exhausted in the process; but of course you want to be careful not to add too little sodium bicarbonate because then you are leaving behind cocaine hydrochloride which can be smoked. So everybody looks at it, sees I have this much cocaine powder, I'm going to add half that much sodium bicarbonate, which is more than enough depending on what you start with, and there's bicarbonate left behind and easily analyzed for.*

D.I. 37 at 173–74 (emphasis added). It appears unlikely, then, that a sample of crack cocaine that was intended for distribution will be utterly bereft of at least some traces of sodium bicarbonate.

**6.** In this case, Bravenec analyzed DEA Exhibits 17, 20 and 23 for the presence of sodium bicarbonate with an instrument called the Fournier Transform Infrared Spectrometer, or the FT–IR. D.I. 37 at 208–09. According to Bravenec, the FT–IR itself is very sensitive to amounts of sodium bicarbonate, but an accurate reading will often depend on the size of the sample extracted

### 2. The Sentencing Guidelines

Section 2D 1.1 of the Guidelines, which would be used to sentence Johnson for Count I, employs a 100:1 ratio for crimes involving cocaine base as opposed to powder cocaine. In other words, the Guidelines provide that a sentencing court use the same base offense level for crimes involving 1.5 kilograms or more of cocaine base that it would for crimes involving 150 kilograms or more of powder cocaine. Prior to 1993, the circuit courts of appeal were divided as to whether "cocaine base" under § 2D1.1 included only "crack," or also covered all other substances considered by the scientific community to be cocaine base. *Compare United States v. Wheeler,* 972 F.2d 927, 930 (8th Cir.1992) (rejecting contention that presence of hydroxyl ion was determinative of whether substance was cocaine base and upholding sentence enhancement, noting "it is undisputed in this case that the twelve rock-like substances could be smoked[.]"); *United States v. Lopez–Gil,* 965 F.2d 1124 (1st Cir.1992) (holding substance was not "crack", although it was cocaine base in scientific sense); and *United States v. Shaw,* 936 F.2d 412 (9th Cir.1991) (forgoing chemical definition of cocaine base and defining it as cocaine that is both pure and smokable); with *United States v. Brown,* 859 F.2d 974, 976 (D.C.Cir.1988) ("The fact that 'cocaine base' may have various interpretations on the street does not make it incapable of objective definition by means of chemical analysis."); *United States v. Rodriguez,* 980 F.2d 1375, 1377 (11th Cir. 1992) (per curiam) (holding substance that was not "rock or crack form" was nonetheless subject to 100:1 enhancement because substance fit scientific definition of cocaine base); and *United States v. Jackson,* 968 F.2d 158 (2d Cir.1992) (holding that oily substance that experts doubted could be used as crack was cocaine base within meaning of § 2D1.1).

from the cocaine base. *Id.* For example, FT–IR testing of samples from DEA Exhibits 17 and 23 revealed no traces of sodium bicarbonate, and Bravenec estimated the odds at one thousand to one that there was any sodium bicarbonate in those samples that went undetected by the FT–IR. D.I. 37 at 222–23.

Seeking to reconcile this split, the Commission proposed amending § 2D1.1. This proposed amendment was adopted by Congress in 1993, and the guideline now reads:

"Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form.

While the Guideline itself is ambiguous—it states cocaine base is crack, then advises " 'crack' is the street name for *a form* of cocaine base[,]" [7] U.S.S.G. § 2D1.1 (emphasis added)—Amendment 487 clarified the intent behind the guideline. In Amendment 487, the Commission expressly noted it aimed to address the conflict among the circuits, and provided: "[F]orms of cocaine base other than crack (e.g., coca paste, an intermediate step in the processing of coca leaves into cocaine hydrochloride, scientifically is a base form of cocaine, but it is not crack) will be treated as cocaine." U.S.S.G. amend. 487.

While not citing Amendment 487, the Third Circuit Court of Appeals held in *United States v. James*, 78 F.3d 851, 858 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 128, 136 L.Ed.2d 77 (1996), that "forms of cocaine base other than crack should be treated as cocaine for purposes of sentencing under the Guidelines." There is a tension inherent in the Guidelines and *James:* to date, the Sentencing Commission has identified two forms of cocaine base which are not considered crack. First, there is coca paste, which is almost never found in the United States. Second, there is freebase cocaine, which seems to have outlived its utility with the emergence of crack cocaine. The Sentencing Commission did not purport to say coca paste and free base cocaine are the only types of cocaine base which are not crack.[8] The burden of proving a substance is crack—and thus subject to the harsh end of the 100:1 ratio—belongs to the Government, which must discharge its burden by a preponderance of evidence. *Id.*

Not surprisingly, given § 2D 1.1 of the Guidelines as amended and the decision in *James,* defendants charged with cocaine-related crimes have routinely pressed the Government to its proof; this opinion is the product of what will almost certainly be merely the first in a string of lengthy evidentiary hearings devoted to the sole and narrow issue of whether the drugs attributed to a certain defendant were crack or some other form of cocaine base.

### III. DISCUSSION

▮ To reiterate, § 2D1.1 of the Sentencing Guidelines states, with emphasis added: "Crack is the street name for a form of cocaine base, *usually* prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." Again, the Government bears the burden of proving the drugs attributed to Johnson in Count I—specifically, the drugs found in Staton's apartment— [9] are crack by a preponderance of the evidence. *James,* 78 F.3d at 858.

Because of the discrepancy in the number of bags submitted to the DEA lab in New York (thirty-five) and the number of bags

7. Bravenec highlighted one of the difficulties in affixing a sentencing enhancement to an offense involving a drug that is identified by what it is called on the street. "Crack is a slang term[,]" he said. "[A]nd unfortunately somebody decided to write that into the law. Cocaine base is a substance that can be smoked. Crack just happens to be a slang term like smack for heroin and so ... if it's cocaine base, you can use that slang term crack." D.I. 37 at 138. Slang can evolve quite rapidly, of course, and nowhere is this more evident than in the assortment of monikers given to smokable cocaine base. At the hearing, Agent Lutz provided just a sample of these names: "crack," "cooked," "cookies," "rock," and "base." D.I. 37 at 111–12, 124.

8. In fact, within the Guidelines and Amendment 487, only coca paste is mentioned as a cocaine base which is not to be considered crack. Freebase cocaine was mentioned by the Sentencing Commission as another form of cocaine base that was not crack in the Commission's special report to the Congress.

9. The parties agreed the type of drugs alleged in Count I of the Information would be determined by any analyses of the cocaine base seized from Staton's apartment and any testimony in support of those analyses. D.I. 23 at ¶ 3.

tested by Bravenec for the presence of sodium bicarbonate (thirty-eight), the Government has shrewdly withdrawn its request that the Court find DEA Exhibit 20A contained sodium bicarbonate or rely upon Bravenec's testimony that DEA Exhibit 20A contained sodium bicarbonate. *See* D.I. 36 at 13 n. 5. Put another way, the Government concedes there are at least even chances DEA Exhibit 20A has become contaminated or altered. The Government can make this concession because most courts have held, based on the first "usually" in the Guidelines definition above, the Government need not prove the substance at issue contain sodium bicarbonate in order to find the substance is crack cocaine. *See United States v. Finch,* 96 F.3d 1448, 1996 WL 494992, at *2 (6th Cir. Aug.29, 1996), *cert. denied,* — U.S. ——, 117 S.Ct. 749, 136 L.Ed.2d 686 (1997); *United States v. Fulton,* 960 F.Supp. 479, 493–94 (D.Mass. 1997); *United States v. Tolson,* 935 F.Supp. 17, 22–23 (D.D.C.1996); *but see United States v. Culpepper,* 916 F.Supp. 1257, 1258 (N.D.Ga.1995) (finding substance was not crack cocaine for sentencing purposes because "the Government did not establish that the substance involved in the case was prepared or manufactured with sodium bicarbonate."), *rev'd & vacated mem.,* 116 F.3d 1493 (11th Cir.1997). Instead, the Government has offered other evidence which, it argues, demonstrates the drugs in Count I should be considered crack cocaine for sentencing purposes. The Court will first examine this evidence piece-by-piece, then as a whole.

■ First, the Government points out, Johnson pled guilty to a charge of Conspiracy to Distribute Cocaine and over 1.5 kilograms of Cocaine Base, a.k.a., *15* Crack. *See e.g.,* D.I. 37 at 5, 8–10, 21, 3743. Further, Johnson admitted during his plea colloquy the substance with which he was charged was "known as crack on the street." *Id.* at 42. Since "there can be no question that admissions to the court by a defendant during a guilty plea colloquy can be relied upon by the court at the sentencing stage," *see James,* 78 F.3d at 856, the Government urges this Court to find the substance attributed to Johnson in Count I of the Information is crack cocaine. But, as the Government acknowledges, Johnson consistently and unequivocally reserved his right to contest the Government's position that the cocaine base is crack for sentencing. *See, e.g.,* D.I. 37 at 38 ("THE DEFENDANT: I agree that it's cocaine base and I want to contest that it's crack for the sentencing purposes."). Accordingly, the only admission made by Johnson during the plea colloquy the Court will consider is his statement the substance he was distributing was known as crack "on the street."

■ The Government also points to the Pre–Sentence Investigation Report ("PSI"). In the PSI, argues the Government, Johnson repeatedly referred to the cocaine base he was distributing as crack. *See* ¶¶ 9, 10, 19, 27 of PSI. It is impossible to discern from the PSI just who is responsible for many of these references, however; Johnson may have referred to the drugs as crack cocaine, or the Probation Officer could have inserted those references himself in an effort to summarize or paraphrase Johnson's conduct. Further, in a paragraph of the PSI which recounts Johnson's confession to DEA Agents, Johnson admitted to distributing "cocaine base." *See* ¶ 28 of PSI. In still other places, the PSI refers to "cocaine base, a.k.a., 'crack'." *See* ¶ 30 of PSI. It appears then, the terms "crack," "cocaine base," and "cocaine base, a.k.a., 'crack'" have been used, if not interchangeably, at least without any reasonable degree of precision and certainly not with an eye to the import of the instant proceeding. Finally, while Johnson did not object to each reference to the substance in the PSI as crack, he did reserve the right to argue the substance should not be treated as crack for sentencing purposes. *See* page ("p.") 24 of PSI. Accordingly, the PSI offers no value for determining whether the drugs in this case were crack or some other form of cocaine base.

Perhaps the best evidence for the Government is in the testimony of Agent Lutz. As noted earlier, Agent Lutz was the first person to handle the drugs found in the safe in Staton's apartment. D.I. 37 at 108. Lutz, who has participated in crack investigations and who has manufactured crack in a DEA training session, testified DEA Exhibit 20

appeared to be crack cocaine when he first removed it from the safe. D.I. 37 at 109. Further, when shown DEA Exhibit 20A at the evidentiary hearing,[10] Lutz testified he believed it was crack cocaine and was known on the street as, among other things, crack. D.I. 37 at 111–12, 131. Lutz's testimony, argues the Government, is sufficient to support a finding the substance alleged in Count I of the Information is, for sentencing purposes, crack cocaine.

■ There is no reason to discount the first portion of Lutz's testimony: that what he pulled out of the safe appeared to him to be crack cocaine. But there is a significant problem with that part of Lutz's testimony in which, when shown DEA Exhibit 20A at the hearing, he stated his belief it was crack cocaine and known on the street as crack. The problem is not one of credibility; Agent Lutz was a credible and competent witness. Rather, the difficulty with this testimony is this: although unconstrained by the Federal Rules of Evidence, a sentencing court may consider only that information which has "sufficient indicia of reliability to support its probable accuracy."[11] *United States v. Brothers*, 75 F.3d 845, 846 (3d Cir.1996) (quoting *United States v. Miele*, 989 F.2d 659, 663 (3d Cir.1993)). Put bluntly, the Government simply cannot show with any reasonable degree of accuracy that the drugs tested by the DEA lab and admitted into evidence at the sentencing hearing were the same drugs seized at Staton's apartment.

As already stated, the DEA sent thirty-five (35) bags of a chunky, rocklike substance to the lab for testing and Bravenec inventoried and tested thirty-eight (38) bags of a chunky, rocklike substance and one (1) bag of a powdery substance. At the evidentiary hearing, the Government suggested the possibility the bags stuck together and it was not until Bravenec separated them did anyone know there were actually more than thirty-five bags submitted by the DEA or there was also a bag containing powder cocaine. This is mere supposition, however; it does not satisfy the standard of "probably accuracy" required to justify this Court's reliance upon it. *See Brothers*, 75 F.3d at 846. There is no evidence to support the Government's justification for the discrepancy in the bags. Bravenec never mentioned bags sticking together when he counted or recounted the number of bags. Nor did he testify the bag containing powder cocaine (evidently unseen or unidentified by Agent Miller) was sticking to a bag of chunky, rocklike cocaine.

In fact, numerous other possibilities abound, each as likely as the Government's *post-hoc* explanation. For example, DEA Exhibit 20 could have been altered from the time Agent Miller sent it to the DEA labs in New York. Or the DEA Exhibit 20A introduced at the hearing could be entirely different from the sample of drugs—DEA Exhibit 20—seized at Staton's apartment. These are just two of the many plausible explanations for the discrepancy in the number of bags seized and the number of bags tested. Given these myriad scenarios, the Court cannot reasonably rely upon Agent Lutz's in-court identification of DEA Exhibit 20A as crack cocaine found in Staton's apartment. While Agent Lutz identified DEA Exhibit 20A as crack cocaine in court, the relevance of his identification is predicated upon a proposition that has been irretrievably thrust into doubt—that the drugs introduced into evidence at the hearing were the same drugs, in substantially the same condition, as the

---

10. As noted earlier, Bravenec separated DEA Exhibit 20 into DEA Exhibit 20A, which contained the chunky, rocklike drugs, and DEA Exhibit 20B, which contained the powder cocaine. DEA Exhibit 20A was admitted into evidence at the sentencing hearing as Government Exhibit ("GX") 5. For the sake of simplicity and consistency, the Court will simply refer to the drugs introduced into evidence at the hearing as DEA Exhibit 20A.

11. The Sentencing Guidelines provide:

When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. *In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.*

U.S.S.G. § 6A1.3(a) (emphasis added).

drugs seized from the safe in Staton's apartment.

■ In review, the Government's has only two pieces of relevant and reliable evidence that the drugs attributable to Johnson for purposes of Count I of the Information are crack: (1) Johnson's admission during the plea colloquy that the drugs he was distributing were known as "crack" on the street; and (2) Agent Lutz's testimony that the drugs he pulled out of the safe in Staton's apartment were off-white, round, and lumpy and, in his opinion, crack cocaine. The Government argues this satisfies the definition of crack found in Section 2D1.1. of the Sentencing Guidelines.

This Court disagrees. Johnson has exploited considerable weaknesses in the Government's case. First, he notes neither DEA Exhibit 17 nor DEA Exhibit 23 tested positive for sodium bicarbonate. While both were classified as cocaine base by Bravenec, the Government failed to elicit any testimony from its witnesses that either exhibit was crack. Indeed, the only testimony regarding the "crack or cocaine base" nature of DEA Exhibits 17 and 23 came from Morgan and was unrebutted. Morgan testified DEA Exhibits 17 and 23 were cocaine base, but not crack, under the interpretation given Section 2D1.1 of the Sentencing Guidelines by the *James* court because they did not contain traces of sodium bicarbonate. D.I. 37 at 175–76. The Court is not bound by this testimony, of course, because it is based on an erroneous interpretation of the law; as the text of Section 2D1.1 indicates, a positive test for sodium bicarbonate is not a prerequisite for finding a sample of cocaine base is crack cocaine. Nevertheless, it remains true there was no evidence presented by the Government that either DEA Exhibit 17 or 23 was crack cocaine, and neither exhibit tested positive for sodium bicarbonate, which, as explained earlier, is almost always present in crack cocaine, absent the use of another base.

This leads to an inference that DEA Exhibits 17 and 23 were cocaine base but not crack cocaine. DEA Exhibit 17 consisted of drugs seized from Johnson during his arrest. DEA Exhibit 23 consisted of drugs seized from Johnson's apartment. Both were seized the same day the DEA executed a search warrant and found what now comprises DEA Exhibit 20 at Staton's apartment. It would not be unreasonable to assume, then, that DEA Exhibit 20 consisted of the same type of drugs as found in DEA Exhibits 17 and 23. Finally, the Court cannot so blithely overlook the blunder that has occurred in this case: the principal piece of evidence in a proceeding to determine whether the defendant will be subject to an exponentially enhanced sentence is suspect.

Given the considerable holes Johnson has so ably punched in the Government's evidence and the reasonable inferences that can be drawn from the scant other evidence, it is equally probable the drugs alleged in Count I of the Information were a form of cocaine base other than crack cocaine, as spelled out in *James*. Accordingly, the Government has failed to prove by a preponderance of evidence the drugs charged in Count I were crack cocaine. For Count I of the Information, Johnson will be sentenced pursuant to the powder cocaine guidelines. An appropriate order will follow.